UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CYNTHIA IRONS                                    CIVIL ACTION

VERSUS                                           NUMBER: 07-9337

MICHAEL J. ASTRUE,                               SECTION: "N"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits. (Rec. docs. 12, 14).

Cynthia Irons, plaintiff herein, filed the subject applications for DIB and SSI benefits on July 8, 2005, alleging disability as of June 7, 2005. (Tr. pp. 51-53).[1]/ In a Disability

_____

[1]/ The application for SSI benefits was not available to be included in the record. (Tr. p. 3).

Report completed by plaintiff on July 8, 2005, she identified surgery-related nerve damage to her arm as the condition resulting in her inability to work. (Tr. pp. 58-67). Plaintiff's applications for DIB and SSI benefits were denied at the first step of the Commissioner's administrative review process on December 30, 2005. (Tr. pp. 47-48). Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on March 6, 2007 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 40-41, 236-249). On May 25, 2007, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 9-20). The Appeals Counsel ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 4-6). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I.  The ALJ failed to find [that] plaintiff's condition meets or equals Listing 11.08.

II. While the ALJ found that plaintiff's depression was a severe impairment, there are no limitations arising from her depression in his RFC.

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.  [t]he claimant met the insured status requirements of the Social Security Act through March 31, 2006.

2.  [t]he claimant has not engaged in substantial gainful activity since June 7, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., and 416.920(b) and 416.971, et seq.

3.  [t]he claimant has the following severe impairments: musculoskeltal disorders and [d]epression. (20 CFR 404.1520(c) and 416.920(c)).

4.  [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity [for] light work activity. The claimant can stand/walk for up to six hours a day. She has no functional use of her non-dominant left arm, but she can perform unskilled work activity.

6.  [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  [t]he claimant was born on July 17, 1963 and was a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that

the claimant is "not disabled," whether or not the claimant has transferrable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

11. [t]he claimant has not been under a disability, as defined in the Social Security Act, from June 7, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 14, 18-20).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a

preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner. <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. <u>Harrell</u>, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1. an individual who is working and engaging in

substantial gainful activity will not be found disabled regardless of the medical findings.

2.  an individual who does not have a "severe impairment" will not be found to be disabled.

3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.  if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5.  if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir.

1988); <u>Fraga</u>, 810 F.2d at 1302.

Plaintiff's attorney opened the administrative hearing that was held on March 6, 2007 by arguing that plaintiff's condition satisfied the criteria of Section 1.02 of the Listing of Impairments based on the lack of use of her left arm, a bulging disc at the L3-L4 level, depression, and the loss of manipulation. (Tr. p. 239). At the time of the hearing, plaintiff was forty-three years of age, had completed high school and possibly some college-level courses, and had past relevant work experience as a security guard at Harrah's Casino and for the Orleans Parish School Board and as a nursing assistant. (Tr. p. 240).

Plaintiff testified that she had been involved in an automobile accident several years earlier and that her condition worsened after she initially delayed getting treatment. Surgery was recommended and after plaintiff obtained a second opinion she underwent a fusion at C5-C6 with hardware installation which left her in constant, unbearable pain. Subsequent testing revealed that plaintiff had sustained nerve damage to her left arm which left the extremity totally useless. (Tr. p. 241). As a result of these physical problems, plaintiff began suffering from depression manifested by a loss of appetite, mood swings, and crying. (Tr. p. 242). Cymbalta had recently been substituted for Zoloft but the desired effect had yet to be achieved. (Tr. p. 244). Plaintiff

testified that one of her physicians had discussed a nerve transplant from the right side which she decided against as there was no guarantee of success. She also testified to being a candidate for lower back surgery. (Tr. p. 242).

In terms of daily activities, plaintiff testified that she did no household chores, cooking, or shopping and did not drive. (Tr. p. 242, 243). She also needed assistance with dressing. (Tr. p. 241). Plaintiff sometimes used a sling for her arm but it caused undue stress to her neck and a prescribed TENS Unit provided little relief. (Tr. p. 244). When asked why she was unable to work plaintiff testified that she could not stand or sit for significant periods of time, was constantly in pain but would be unable to take a sufficient amount of pain medication on the job, and could not perform at a sufficient pace. (Tr. p. 245).

Page ten of the transcript of the administrative hearing bears the notation "recording broken" and then resumes with the testimony of the VE, Judith Beard. In response to the ALJ's inquiry, plaintiff testified that the security job she had at Harrah's involved walking the floors of the casino and reporting any unlawful activity. (Tr. p. 246). The VE then testified that such security jobs are generally semi-skilled[2] and performed at the

---

[2] The VE originally stated that plaintiff's security job was unskilled (Tr. p. 246) and amended that to semi-skilled in later

light exertional level with plaintiff's job as a nursing assistant being semi-skilled at the medium level. The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and past work experience who could perform a limited range of light-level work without use of the left arm and who had a moderate limitation on the ability to concentrate such that she could not perform skilled work activity or pay close attention for long periods of time without a break. In answer to that hypothetical question, the VE testified that the described individual would be unable to perform plaintiff's past work. However, the VE testified that the hypothetical individual could function as a clerical sorter, as an assembler of printed products, or as a clerical checker.[3]/ Upon being tendered to plaintiff's attorney for further questioning, counsel attempted to amend the hypothetical question by including some additional limitations that had been noted by Dr. Shults. However, the ALJ interjected and suggested that Dr. Shults' opinions not be taken too literally. Shortly thereafter, a second notation of "recording broken" appears and the transcript came to an abrupt conclusion. (Tr. pp. 245-249,

testimony. (Tr. p. 247).

[3]/ The record does not reflect that the VE testified that plaintiff could function as a clerical checker due to a break in the recording. The ALJ, however, so states in his opinion and plaintiff does not contest this finding.

19).

The medical evidence generated during the relevant time period begins with emergency room records from the Meadowcrest Hospital dated July 3, 2004 where plaintiff was seen for fever and stomach cramps and was discharged. (Tr. pp. 112-116). On February 9, 2005, plaintiff was evaluated by Dr. Robert D. Lesser for complaints of pain in the left ear and left hand with some tingling. The impression was possible carpal tunnel syndrome and plaintiff was referred for various testing and was placed on a trial of Celebrex. (Tr. pp. 153-154). Plaintiff returned to Dr. Lesser on March 29, 2005 and complained of back pain and generalized body aches, nausea, weakness, and malaise of two days' duration. The impression was general viral syndrome versus gastroenteritis and lower back/cervical pain for which plaintiff was treated conservatively and was to obtain various testing, including an MRI. (Tr. pp. 151-152). The latter testing was conducted at Touro Infirmary on April 5, 2005. An MRI of the thoracic spine was unremarkable and identical testing of the cervical spine revealed mild narrowing at C5-6, some dessication of the C2-3, C3-4, C4-5, and C5-6 discs, and extradural ventural impression of the thecal sac at C4-5, C5-6, and, to a lesser extent, at C6-7. Transaxial images revealed a mild posterior central disc protrusion at C3-4, a left posterior paracentral disc protrusion at C4-5, a posterior

central disc protrusion indenting the ventral thecal sac and the left ventral surface of the cord at C5-6 and, a circumferential disc bulge at C6-7. (Tr. pp. 136-137).

Plaintiff was seen again by Dr. Lesser on April 18, 2005 for complaints of fever of several days' duration and a loss of appetite. She was prescribed Vicodin ES for back/neck pain, Xanax for anxiety, and was given some Flonase samples. (Tr. pp. 145-146). Plaintiff was next seen by Dr. Bryant George, a neurological surgeon, on May 11, 2005 in connection with her complaints of neck pain. Range of neck motion was decreased by some unspecified degree but strength was normal. (Tr. pp. 126-133). On that same day, Dr. Lesser issued a "Letter of Return to Work or School" in which he stated that plaintiff had been under his care for neck pain from May 11th to May 13th but would be able to return to work on May 15, 2005. (Tr. p. 127). Plaintiff was evaluated a second time by Dr. Bryant on May 25, 2005. The chief complaint was cervical pain and plaintiff was noted to have tenderness in the trapezius muscle base, a restricted range of motion of the cervical spine, and decreased sensation at C6 on the right. The diagnosis was cervical neuritis and Vicodin ES was prescribed. (Tr. pp. 121-125).

Plaintiff apparently underwent a two-level cervical fusion with hardware installation on June 7, 2005 but no records of that

procedure were admitted in the administrative proceedings below. She subsequently had an EMG and nerve conduction studies on June 24, 2005 at the Neurology Clinic in New Orleans. The EMG of the left deltoids and biceps revealed increased insertional activity and spontaneous activity with a moderate decrease in the motor unit recruitment pattern and a corresponding increase in the number of polyphasic and high amplitude motor units. Nerve condition studies were essentially normal. The testing physician's impression was hyperacute severe left C5 and C6 radiculopathies. (Tr. pp. 134-135). On June 29, 2005, Dr. George prescribed a six-week course of physical therapy at a frequency of three sessions per week. (Tr. p. 118). A sling for plaintiff's left arm was also prescribed. (Tr. p. 119).

As noted earlier, plaintiff filed the subject applications for DIB and SSI benefits on July 8, 2005, completing various forms eliciting information about her condition and capabilities at that time and shortly thereafter. In Adult Function Reports plaintiff indicated that she needed assistance in dressing herself, could perform no household chores, and was only capable of preparing frozen dinners, but was capable of shopping. (Tr. pp. 68-83). Between July 14 and July 27, 2005, plaintiff attended physical therapy at Meadowcrest Hospital, describing her pain as a "8" on a scale of 1 to 10 at the outset of that course of treatment. (Tr.

pp. 105-107). In another note appearing in the record, plaintiff subjectively characterized her pain as an "8" with almost no normal motion available and a total inability to function. (Tr. p. 111). By July 20, 2005, the pain had decreased to a level "7" and by July 25, 2005 plaintiff declared it to be at a level of "9". (Tr. pp. 108-110).

Plaintiff returned to Dr. George on July 27, 2005 for further monitoring of her left arm condition. (Tr. p. 117). She was next seen by Dr. Lesser on August 22, 2005 for complaints of a fever and left ear pain. Plaintiff had neck pain with spasms and was still greatly concerned about her left arm as it had shown no improvement. The diagnosis included left arm paralysis of unknown etiology and depression. Plaintiff's regular medications were refilled and she was also prescribed a muscle relaxer and Lexapro. (Tr. pp. 147-148). Approximately two months later, plaintiff underwent a second round of EMG and nerve condition studies at the hands of Dr. Michael Puenete. While the NCV study was normal, a needle exam revealed severe denervations in the C5-C6 innervated muscles without evidence of reinnervation. The impression was an abnormal study demonstrating findings consistent with a severe nerve root injury at C5-C6. (Tr. pp. 185-189).

On November 16, 2005, plaintiff presented herself at the Algiers Fischer Clinic with complaints of an earache and left arm

13

and neck pain. Although hand and finger functions were intact, plaintiff had no wrist, elbow, or shoulder movement and had shooting pain in the left arm. The left shoulder was noted to be atrophied and brachialis reflexes were diminished. Plaintiff was given Elavil for her neurological pain and was referred to an orthopedist. (Tr. p. 181).

On November 25, 2005, Dr. Puente prepared a narrative "memo to the chart" to supplement his EMG and nerve conduction study findings from October 28, 2005. There, Dr. Peunte recalled that plaintiff had underdone extensive neck surgery by Dr. George on June 7, 2005 at the C4 through C6 levels. Plaintiff related that she emerged from surgery unable to move her left arm and was told by Dr. George that the condition was transient and would resolve in a few months. Plaintiff then had her first EMG and was told that she had suffered nerve damage. Upon returning to Dr. George, he remained steadfast that her condition would resolve over time. Hurricane Katrina hit New Orleans shortly thereafter and plaintiff lost all contact with Dr. George. Plaintiff thus presented herself to Dr. Peunte in an effort to find a physician who could possible remedy her left arm situation. On neurological examination, plaintiff's neck was non-tender with a full range of motion and manipulation in all directions elicited no symptoms. However, plaintiff had total weakness of the left deltoid, superaspinatus,

infraspinatus, biceps, and brachioradialis muscles with essentially intact strength elsewhere and with some apparent atrophy to the left deltoid. Dr. Peunte's impression was severe acute C5-6 nerve root injury on the left. Plaintiff was referred to a neurosurgeon to determine whether some type of nerve anastomsis was possible. (Tr. pp. 183-184).

On December 15, 2005, plaintiff underwent a consultative evaluation by Dr. Jonathan Shults, an orthopedic surgeon. Complaints voiced by plaintiff at the time were depression, paralysis of the left arm, and cervical fusion. Plaintiff advised the doctor that she had been rear-ended by an 18-wheeler in 1997 and thereafter began experiencing neck pain which was treated with physical therapy. She ultimately went under the care of Dr. George who performed the anterior cervical discectomy and fusion at C4-5 and C5-6 in June of 2005. Since that time, consultations with other doctors provided little promise. At the time of Dr. Shults' evaluation, plaintiff's only complaint was weakness in the left arm. She denied any neck or arm pain, decreased sensation, or abnormal movements but had not been able to resume her most recent job as a school security guard. Plaintiff did occasionally have some numbness to the cheek on the right side. Medications at the time included Vicodin, Alprazolam, and an anti-depressant.

On physical examination, plaintiff had a full range of motion

of neck motion with full extension, flexion, lateral bending, and rotation. She had a full passive range of motion to the shoulders, elbows, and wrists bilaterally but there was no active elevation to forward flexion or abduction of the left arm. Plaintiff noted wasting of the deltoid and suprasinatus muscles and biceps tendon but had a full range of motion to the wrists, fingers, and IP joints. Strength testing of the upper extremities was measured at 0 to the deltoid and 2/5 to the biceps. Dr. Shults' impression was post-operative complications in the form of motor nerve root damage to the left upper extremity leaving plaintiff with near paralysis of her functional arm muscle units but with no decreased sensation and with a full range of motion of the joints, although lacking the motor units to move them. It was also possible that range of motion would diminish over time due to ankylosing. The doctor believed that the prognosis for significant improvement was poor and that it would be very difficult for plaintiff to function as a security guard. Plaintiff would be able to sit, stand, and walk without difficulty but would be very challenged in lifting, carrying, or handling objects of any size. (Tr. pp. 157-160).

On December 22, 2005, Dr. Shults supplemented his earlier report with radiological findings. Lateral cervical spine x-rays revealed that the metallic plate at the C4-5 and C5-6 levels did not appear to be entirely on the vertebral bodies anteriorly.

There also appeared to be a slight non-union at the C4-5 level but there were no signs of breakage of any hardware and there were no signs of any displacement.  In an AP view of the cervical spine, the plate appeared to be in a slightly angled position but there were no signs of any graft or plate failure. (Tr. p. 156).

An Administration medical consultant reviewed plaintiff's file and medical records and completed a Physical Residual Functional Capacity Assessment form on December 28, 2005.  The primary diagnosis was identified as "disorder of the cervical spine" with a secondary diagnosis of "motor nerve root damage (R) (sic) upper ext."  There, the consultant checked off the appropriate boxes on the form to indicate that plaintiff could occasionally lift twenty pounds and could frequently lift ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had a limited ability to push and/or pull in the upper extremities due to the non-functioning motor units in her left arm; could only occasionally perform various postural maneuvers; was limited in reaching in all directions; and, had no visual, communicative, or environmental limitations.  In the consultant's opinion, plaintiff's allegations were considered to be partially credible but the objective evidence did not support the degree of limitation that she claimed. (Tr. pp. 160-167).

Plaintiff was next seen at the Covenant House Community Health

Center on January 9, 2006. Her chief complaint was that she was in pain which was described as intermittent, mostly at night, an "8" out of 10 in intensity. Plaintiff was instructed to follow-up with a pain clinic. On that same day, plaintiff also requested an evaluation in connection with her ongoing depression, stating that she had crying spells almost daily, had a loss of appetite and energy, was experiencing feelings of helplessness and guilt, had decreased and restless sleep, and had lost interest in pleasurable activities. Plaintiff was evaluated as requested and was diagnosed with major depression, single episode, and an anxiety disorder. She was continued on Effexor, was given a trial of Vistaril, and was recommended for various testing. (Tr. pp. 193-200).

On February 13, 2006, plaintiff returned to Dr. Lesser with complaints of decreased sensation, strength, and function in the right hand. The treatment note contains a positive notation for anxiety. Plaintiff was referred to a neurosurgeon and was continued on pain medication. (Tr. pp. 232-235). By April 12, 2006, plaintiff reported an increase in her depression and the presence of left arm pain. Plaintiff was started on Zoloft and was referred to a psychologist. (Tr. pp. 224-231). On May 9, 2006, plaintiff underwent various testing that had been ordered by Dr. Lesser. A nuclear medicine bone scan was normal as was a CT scan of the inner ear. Further nerve conduction studies revealed left

median nerve neuropathy. (Tr. pp. 220-223). Plaintiff was next seen by Dr. Lesser for a routine visit on May 19, 2006. She still complained of pain and a decreased range of motion as a result of her cervical fusion from 2005. Plaintiff was continued on pain medication, Zoloft, and Ambien and was recommended for further testing in light of an increase in nitrates. (Tr. pp. 211-219).

The next treatment note appearing in the record documents plaintiff's return visit to Dr. Lesser on July 26, 2006 for monitoring of her depression and neck condition. The note was positive for pain related to her previous cervical fusion and decreased range of motion to some unspecified degree. Once again, plaintiff was simply continued on pain management, Zoloft, and Ambien. (Tr. pp. 209-210). Plaintiff had another routine visit with Dr. Lesser on October 2, 2006. Although she reported that her left arm was getting better, examination showed the arm to be severely weak and limp with a reduced range of motion to the cervical spine. Plaintiff was continued on pain medication, Zoloft, and Ambien and was referred for physical therapy. (Tr. pp. 205-208). She was next seen at the Algiers Fischer Clinic on October 12, 2006 for complaints of a headache and hot flashes. Various testing was ordered. (Tr. p. 180). Plaintiff returned to the Clinic on November 7, 2006 for further evaluation and to obtain her lab results. The impression was hyperlipidemia, abnormal liver

functions, and hypertension. Medications were prescribed and plaintiff was counseled on diet and exercise. (Tr. pp. 172-175).

Plaintiff had another routine office visit with Dr. Lesser on December 6, 2006 with the list of concerns being identified as status-post fusion with left arm paralysis, neck pain, back pain, and depression. The note is positive for shoulder pain but plaintiff reported that her depression had decreased. Plaintiff was continued on her pain medication and Lexapro was to be substituted for Zoloft to minimize some unwanted side effects. Testing was to be conducted for plaintiff's continued complaints of shoulder pain and back/neck pain. (Tr. pp. 202-205). Plaintiff reported increased stress, crying spells, and sleeping difficulties when she was next seen at the Algiers Fischer Clinic on January 16, 2007. One of the treatment notes from that date contains a diagnosis of major depressive disorder, severe, single episode with obsessive compulsive traits and a plan to wean plaintiff off of Zoloft and to start her on Cymbalta. The second treatment note from that date contains an impression of hypertension and depression with the dosage of plaintiff's Diovan to be increased. (Tr. pp. 170-171).

On January 30, 2007, plaintiff's counsel provided the Administration with a list of plaintiff's medications which included Prednisone, Hydrocodone, Zoloft, Carisprodol, Cymbalta,

and Extra Strength Tylenol. (Tr. pp. 101-103). On that same day, plaintiff was seen for follow-up care for the final time at the Algiers Fischer Clinic. The brief progress note contains a diagnosis of major depressive disorder, severe, with medications in the form of Cymbalta and Risperdal to aid with mood control and sleep. Plaintiff was to return to the Clinic on February 6, 2007. (Tr. p. 169). As noted earlier, the hearing before the ALJ went forward on March 6, 2007. (Tr. pp. 236-249).

Plaintiff challenges the Commissioner's decision to deny DIB and SSI benefits on two grounds. In the first of those, plaintiff alleges that the ALJ erred in failing to find that her condition met or equaled the criteria of that set forth Section 11.08 of the Listing of Impairments.

Section 11.08 provides that a claimant will be presumptively considered disabled if she suffers from "*[s]pinal cord or nerve root lesions, due to any cause* with disorganization of motor function as described in 11.04B." Section 11.04B, in turn, requires evidence of "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." (Emphasis added). The plaintiff bears the burden of proof in establishing that her impairment satisfies all of the criteria of a particular section of the Listing of Impairments.

<u>Sullivan v. Zebley</u>, 493 U.S. 521, 530-31, 110 S.Ct. 885, 891 (1990).

Although the medical evidence unquestionably demonstrates that plaintiff has no functional use of her left arm, Section 11.08 requires that there be significant and persistent disorganization of motor function in <u>two</u> extremities resulting in sustained disturbance of gross and dexterous movements. <u>See</u>, e.g., <u>Farrell v. Sullivan</u>, 878 F.2d 985, 990 (7th Cir. 1989); <u>Mote v. Shalala</u>, 1995 WL 358636 at *10 (N.D. Ind. 1995). At the administrative hearing, plaintiff was specifically asked whether "... there [were] any impairments or anything wrong with your right arm or hand", to which she responded in the negative. (Tr. p. 245). In terms of the treatment records, the only mention made of plaintiff's right upper extremity was when she was seen by Dr. Lesser on February 13, 2006 and complained of decreased sensation, strength, and function in the right hand. (Tr. pp. 232-235). However, that sole reference does not establish "significant and persistent disorganization of motor function" of a second extremity as required by Section 11.08. The ALJ was thus correct in concluding that "... claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 ...". (Tr. p. 14). The fact that the ALJ did not specifically cite Section 11.08 is not dispositive as

procedural perfection in administrative proceedings is not required. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988).

In her second challenge to the Commissioner's decision plaintiff argues that the ALJ, after concluding that her depression was a severe impairment, erred by failing to include any depression-related limitations when determining her residual functional capacity ("RFC") to work.

The burden of proof that a claimant bears in establishing that she suffers from a severe impairment is a relatively low one; an impairment can be considered as not severe only if it is a slight abnormality having such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of her age, education, and work experience. Anthony, 954 F.2d at 293; Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985); Estran v. Heckler, 745 F.2d 340, 341 (5th Cir. 1984). As a result, where a claimant suffers from an impairment which is more than a "slight abnormality", the Fifth Circuit has disapproved of the summary dismissal of benefits applications at the second step without consideration of the remaining steps in the sequential analysis. Anthony, 954 F.2d at 293-94; Stone, 752 F.2d at 1102-04.

The Regulations also provide that, if the fourth step of the sequential analysis set forth in §§404.1520 and 416.920 is reached, the ALJ is required to determine a claimant's RFC which is defined

as what the claimant can still do despite her limitations. 20 C.F.R. §§404.1520(e), 404.1545, 416.920(e), and 416.945. Once that assessment is made, the ALJ then compares the demands of the claimant's past work with her present capabilities to determine if prior jobs can be performed. 20 C.F.R. §§404.1520(e) and 416.920(e); <u>Villa</u>, 895 F.2d at 1022; <u>Hollis</u>, 837 F.2d at 1386. If the fifth step in the analysis is reached, the ALJ must consider the claimant's RFC, along with her age, education, and past work experience, to determine if there is any other work available that the claimant can perform. 20 C.F.R. §§404.1520(f) and 416.920(f). Just like the ultimate decision of whether or not a claimant is disabled, the responsibility for determining a claimant's RFC lies with the ALJ. 20 C.F.R. §§404.1546 and 416.946.

In addressing plaintiff's second challenge to the Commissioner's decision, the Court notes that she failed to identify depression as a disabling condition when she initially applied for Social Security benefits. <u>Guerin v. Shalala</u>, 29 F.3d 623 (5th Cir. 1994)(table)(citing <u>Pierre v. Sullivan</u>, 884 F.2d 799, 802 (5th Cir. 1989)). At step two of the sequential analysis, the ALJ found that plaintiff suffered from severe impairments in the form of musculoskeltal disorders and depression. Having found that plaintiff's depression was a severe impairment, the ALJ properly elicited testimony from a VE rather than simply applying the

Medical-Vocational Guidelines of the Regulations at the fifth step of the sequential analysis. <u>Loza v. Apfel</u>, 219 F.3d 378, 398-99 (5th Cir. 2000). In formulating his hypothetical question to the VE, the ALJ included a moderate limitation in the ability to concentrate such that plaintiff could not perform skilled work activity or work which would require her to maintain close attention for long periods of time without a break. (Tr. p. 247). Contrary to plaintiff's present assertion, the ALJ thus recognized and included depression-related, non-exertional limitations in assessing her RFC to work.

While the ALJ may not have specifically mentioned the recognized non-exertional limitations in finding number five of his written decision, a fair reading of the decision as a whole confirms that he did, in fact, credit and consider such limitations in making the RFC assessment. After discussing the evidence pertaining to plaintiff's musculoskeltal problems, the ALJ continued as follows:

> [t]he undersigned has also considered whether the claimant has had a mental impairment which has caused vocational limitations. There is no record of any psychiatric hospitalization or any long term counseling from a mental health professional, only medication for depression prescribed by her doctor. The claimant has been diagnosed with [d]epression. Based on the record, the undersigned finds that the claimant's mental condition has not caused more than mild limitations in daily living activities and in social functioning, or more than moderate limitations in concentration,

persistence, or pace. She has had no episodes of decompensation. The claimant's mental impairment does not significantly erode her residual functional capacity, and she would be capable of jobs requiring simple, one or two step instructions, as shown by her daily activities described below.

* * * * * * * * * * * *

[a]lthough the claimant has alleged she has had problems with physical and emotional pain and fatigue, and she cannot perform work activity, the objective evidence does not support her allegations. The evidence does not preclude the ability to sit, stand, and walk and to use her right, dominant arm. Her alleged depressive condition also has not precluded her from doing many daily tasks. The claimant stated in her application for disability that she shops for food for three hours at a time, pays bills, counts the change, reads, watches television, goes to church and visits with friends and family on a daily basis. She also stated she can feed herself and use the toilet on her own, although she needs some help bathing and dressing. (Exhibits 2E; 3E). These activities and her ability to use her right arm and to move around undermine her credibility with regard to a disability.

* * * * * * * * * * * *

[a]ccordingly, the undersigned finds the claimant retains the following residual functional capacity: light work activity. The claimant can stand/walk six out of eight hours, and can have no use of ropes, ladders, or scaffolds and no functional use of her non-dominant left arm. She needs one to two step instructions and routine tasks. 6-2p, 96-5p, 96-6p, and 06-3p.

(Tr. pp. 16-17).

In answer to the hypothetical question containing the non-exertional limitations recognized by the ALJ, the VE identified various jobs that plaintiff would be able to perform. The VE's

testimony in that regard constitutes substantial evidence that plaintiff was not disabled.  See Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994).

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this __4th__ day of ___February_____,
2009.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

27